# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **SPECIALTY MEDICAL PRODUCTS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 3:14-cv-1152** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **BILLY D. HALL, JR., GREG WHITFORD,** | ) | |
| **and ALPHA MEDSOURCE, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## CORRECTED MEMORANDUM

There are three motions before the court. First, defendants Billy D. Hall, Jr. ("Hall"), Greg Whitford ("Whitford"), and Alpha Medsource, LLC ("Alpha") have filed a Motion for Summary Judgment (Docket No. 58), to which plaintiff Specialty Medical Products, Inc. ("SMP") has filed a Response in opposition (Docket No. 67), the defendants have filed a Reply (Docket No. 70), and SMP has filed a Sur-Reply (Docket No. 74). Second, the defendants have filed a Motion to Exclude All Proof of Damages Under Federal Rule of Civil Procedure 37 ("Motion to Exclude Proof of Damages") (Docket No. 61), to which SMP has filed a Response (Docket No. 65). Third, the defendants have filed a Motion to Exclude Undisclosed Documents and Strike Paragraphs Four Through Eight of the Declaration of Anthony Lair ("Motion to Exclude Declaration and Documents") (Docket No. 69), to which SMP has filed a Response (Docket No. 71). For the following reasons, (1) the Motion for Summary Judgment will be granted in part and denied in part; (2) the Motion to Exclude Proof of Damages will be denied; and (3) the Motion to Exclude Declaration and Documents will be denied as moot.

## FACTS AND PROCEDURAL BACKGROUND[1]

This case arises from the departure of sales employees Whitford and Hall from SMP and their creation of an allegedly competing venture, Alpha. SMP alleges that, in doing so, Whitford and Hall violated restrictive covenants contained in their employment agreements with SMP and breached their fiduciary duties to SMP, resulting in injuries to SMP's business. SMP is a Georgia corporation that distributes neonatal and pediatric products throughout the southeastern United States. Hall is a citizen of Davidson County, Tennessee. Whitford is a citizen of Mecklenburg County, North Carolina. Alpha is a Tennessee limited liability corporation that sells and distributes medical products, with a principal place of business at Whitford's residence in Mecklenburg County, North Carolina.[2]

## I.    Employment Agreements

SMP hired Whitford in 2001. On April 1, 2001, Whitford entered into an employment agreement (the "Whitford Agreement") with SMP. The Whitford Agreement contains a provision concerning non-solicitation of customers and vendors that provides:

---

[1] Facts are taken in part from the Response to the Statement of Undisputed Facts in Support of the Motion for Summary Judgment ("RSUF") (Docket No. 68), as well as from deposition transcripts and other evidence adduced by the parties. Disputes of fact, where relevant and material, are discussed. In addition, for purposes of judicial economy, the court limits its consideration of the facts to those necessary to decide the relevant issues. Because of certain of the court's rulings, a discussion of all of the facts presented by the parties is unnecessary.

[2] Accordingly, there is true diversity between the plaintiff and defendants in this action, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties do not dispute that this court has personal jurisdiction over them or that venue is proper in this district.

> Non-Solicitation of Customers and Vendors:  Employee agrees and covenants that during his employment and for a period of twelve months following the termination of Employee's employment for any reason whatsoever, Employee shall not (except on behalf of or with the prior written consent of the President of the Company), either directly or indirectly, on Employee's own behalf, or on behalf of others, (a) solicit, divert, or appropriate to or on behalf of any Competing Business, or (b) attempt to solicit, divert or appropriate to or on behalf of any Competing Business, any business of the type set forth in Paragraph 1(a) from any Customer or Vendor or actively sought prospective Customer or Vendor of Company.  With respect to the twelve-month period following termination of employment, this non-solicitation covenant shall be limited to those Customers or Vendors or actively sought Customers or Vendors with whom Employee has had material contact during the last twelve months of Employee's employment by Company.  Further, this Section 4 shall not limit Employee's right to solicit any such Customer, Vendor, or prospective Customer or Vendor with respect to the purchase or sale of medical products other than products then being sold or proposed to be sold by Company.

(Docket No. 59-1 at ¶ 4.)  The Whitford Agreement also contains a provision concerning the confidentiality and non-disclosure of confidential information, which provides:

> Confidentiality and Non-Disclosure:  Employee acknowledges and agrees that all Proprietary Information and all physical embodiments thereof are confidential to and are and will remain the sole and exclusive property of Company.  Except to the extent necessary to perform his duties for Company, Employee will not reproduce, use, distribute, disclose or otherwise disseminate any Proprietary Information or any physical embodiment thereof, and will take no action causing, or fail to take any action necessary to prevent causing, any Proprietary Information to lose its character as Proprietary Information.  Upon request by Company, and in any event upon termination of Employee's employment with Company for any reason, Employee will promptly deliver to Company all property belonging to Company, including without limitation all Proprietary Information (and all embodiments thereof), and all documents, records, notes and other material of whatever kind pertaining to the Proprietary Information, whether developed by Company or Employee, then in his custody, control or possession.

(*Id*. at ¶ 2.)  "Proprietary Information" is defined in the Whitford Agreement as "Confidential

Information and Trade Secrets of Company, and includes information disclosed to Company by a

third party which Company is obligated to treat as confidential." (*Id*. at ¶ 1(g)).  Finally, the

Whitford Agreement contains a provision concerning non-solicitation of personnel of the

company, which provides:

> <u>Non-Solicitation of Personnel of Company</u>:  Employee further
> agrees and represents that during the term of his Employment and
> for a period of twelve months following the termination of
> Employee's employment for any reason whatsoever, Employee
> shall not, either directly or indirectly, on Employee's own behalf as
> an owner of a Competing Business, or on behalf of any other
> Competing Business, solicit, divert or hire or attempt to solicit,
> divert or hire, any Personnel of Company (limited, during the
> post-termination period, to Personnel of Company with whom
> Employee had material contact in the course of Employee's last
> twelve months of employment by Company), for the purpose of
> having such person perform duties similar to those performed by
> such person for or on behalf of Company. The provisions of this
> Paragraph 5 shall only apply to those Personnel of Company
> employed by Company at the time of such solicitation or attempted
> solicitation.

(*Id*. at ¶ 5.)  "Personnel of Company" is defined as "any person employed by Company, either

for a determined period or at will, as an employee or as an independent contractor."

(*Id*. at ¶ 1(d)).

SMP hired Hall in 2009.  In February 2009, Hall entered into an employment agreement

with SMP (the "Hall Agreement").  Like the Whitford Agreement, the Hall Agreement also

contains provisions concerning the non-solicitation of customers, the non-solicitation of

employees, and the non-disclosure of confidential information, respectively, as follows:

> Non-Disclosure of Confidential Information:  Except to the extent necessary to perform the services for which Employee is employed by Company, during the term of Employee's relationship with Company and for a period of three (3) years following the termination thereof (unless a longer period of protection is provided by law) Employee will not copy, reproduce, use, distribute, disclose or otherwise disseminate the Confidential Information, or any physical embodiments thereof, and will in no event take any action causing, or fail to take any action necessary in order to prevent, any Confidential Information disclosed to or developed by Employee to lose its character or cease to be Confidential Information. Employee will take all reasonable steps to ensure that each reproduction, summary, extract or analysis of any of the Confidential Information will be marked prominently with a legend identifying it [a]s confidential or proprietary.

(Docket No. 59-2 at ¶ 2.2(a).)

> Non-Solicitation of Customers:  During the term of Employee's relationship with Company and for a period of one (1) year following the termination thereof, Employee shall not (except on behalf of Company), directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Customer or any representative of a Customer of Company for purposes of or with a view to providing goods or services competitive with or potentially competitive with those goods or services provided by Company within the last twelve (12) months of Employee's employment by Company, provided that the restrictions set forth in this subsection shall apply only to Customers or representatives of Customers with whom Employee had regular or material Business-related contact during the last twelve (12) months of Employee's employment by Company.

(*Id*. at ¶ 2.3.)

> Non-Solicitation of Employees and Contractors: During the term
> of Employee's relationship with Company and for a period one (1)
> year following the termination thereof, Employee shall not, either
> directly or indirectly, on Employee's own behalf or on behalf on
> [sic] any other person or entity, solicit or attempt to solicit to leave
> employment or terminate his or her relationship with Company any
> person who is an employee or independent contractor of Company
> for the purpose of having such person perform duties similar to
> those performed by such person for or on behalf of Company. The
> provisions of this subsection shall only apply to those persons
> employed by Company at the time of the termination of
> Employee's relationship with the Company.

(*Id*. at ¶ 2.4.)

All restrictive covenants in the Whitford and Hall Agreements are expressly governed by

Georgia law. (*See* Docket No. 59-1 at ¶ 8(f); Docket No. 59-2 at ¶ § 4.2.)

## II. __Hall and Whitford's Employment at SMP__

Whitford and Hall were sales representatives for SMP. Whitford managed SMP's sales

team and reported to SMP's owner, Tony Lair ("Lair"). He was also assigned a specific multi-

state sales territory. Overall, Whitford was charged with identifying and establishing

relationships with manufacturers whose products SMP might sell, as well as customers to whom

SMP might sell those products. Hall was a sales representative with non-managerial

responsibilities similar to those of Whitford; he was also assigned a specific multi-state territory.

Whitford and Hall contend that this employment arrangement continued until March 1,

2013, when Hall was moved by Lair from the employ of SMP to become an employee of

NeoMed, Inc. ("NeoMed"), a medical products manufacturer also controlled by Lair.[3] The

---

[3] NeoMed is a corporation separate from SMP and is not owned by SMP, but NeoMed is owned by Lair, who also owns SMP. NeoMed and SMP share several key employees, including the Vice President of Finance and Office Manager.

parties dispute for which entity Hall worked between March 1, 2013 and his resignation on March 31, 2014. The defendants rely on the following facts, based in part on the testimony of Hilary Sherman ("Sherman"), SMP's Vice President of Finance: (1) from March 1, 2013 forward, SMP did not issue Hall's paychecks; (2) SMP did not issue a W-2 to Hall for the relevant time period; (3) SMP did not treat Hall as an employee for purposes of complying with Georgia's unemployment insurance laws; (4) the entirety of Hall's wages from March 1, 2013 forward were paid by NeoMed; and (5) NeoMed was the only entity withholding wages from Hall's paychecks for tax purposes during the relevant time period. (Docket No. 57-3 at pp. 33-37, 42-43.)

SMP, however, highlights testimony from Lair that, on March 1, 2013, Hall accepted a job with NeoMed to be a regional sales manager "in addition to his SMP territory responsibilities." (Docket No. 68-1 at p. 71.) Moreover, Sherman testified that, on March 1, 2013, although Hall was switched to the NeoMed payroll, he received compensation for work performed on behalf of both SMP and NeoMed. (Docket No. 68-2 at p. 36.) Sherman stated that, while Hall's check was issued by NeoMed, any compensation received for work done on behalf of SMP was "billed back" from NeoMed to SMP and accounted for on SMP's general ledger. (*Id*.) Similarly, Sherman testified that NeoMed did handle withholding taxes for Hall, "[b]ut the withholding monies, the taxes due from the retrospective amount of work done through [SMP] [were] also billed back to [SMP]." (*Id*. at p. 37.) Additionally, SMP has adduced evidence that Hall's business expenses associated with his SMP work were paid for by SMP. (Docket No. 68-3 at pp. 120-21.)

The record also reflects several statements made by Hall himself about whether he was

still employed by SMP after March 1, 2013. In his deposition testimony, Hall was asked whether he was still the territory manager for SMP as of March 30, 2014 (in other words, throughout his tenure with NeoMed after March 1, 2013). Hall responded in the affirmative. (Docket No. 68-4 at p. 91.) Hall further testified that, once he assumed his NeoMed role, he continued to perform his duties as a sales representative for SMP (though with a reduced territory), for which he received SMP commissions.[4] (*See id*. at pp. 30-32; 34-36; 44-53; 199-200). In addition, when Hall eventually resigned on March 31, 2014, he submitted a letter stating that he was "resigning [his] positions as eastern divisional sales director for NeoMed and territory manager for [SMP]."[5] (Docket No. 67-2 at p. 91.)

### III.    The Formation of Alpha and Alleged Solicitation of Fisher & Paykel

Forming Alpha had been Whitford's idea, and he recruited Hall to join him in the venture. On March 24, 2014, Whitford resigned from SMP. On March 25, 2014, Whitford established Alpha with the Tennessee Secretary of State. On March 31, 2014, Hall resigned and joined Whitford as co-owner of Alpha.

---

[4] For example, this exchange occurred between counsel for SMP and Hall:
> Q. So I think I've been assuming this but let's get it clear on the record. Originally you worked exclusively for SMP. Correct?
> A. Yes, sir.
> Q. And that would have been from approximately February of '09 until, I believe you said, about March 1st of 2013. Is that right?
> A. Yes, sir.
> Q. And then for the remainder of your employment, you performed tasks both for NeoMed and for SMP. Correct?
> A. Yes, sir.

(Docket No. 68-4 at p. 35-36.)

[5] NeoMed sought to have Hall enter a non-solicitation agreement with NeoMed, but Hall refused. (Docket No. 59-3 at p. 47-51.)

According to Hall and Whitford, one of SMP's clients, Fisher & Paykel ("F&P"), had independently become concerned with several developments at SMP, including SMP's firing of a key salesman, Wendell Thompson ("Thompson"), and Lair's decision to compete with F&P via NeoMed's line of products.  (*See* Docket No. 59-5.)  Hall and Whitford's version of events is that they did not solicit F&P's business until Whitford resigned and formed Alpha.  They maintain that, on the day after Whitford resigned, he called David Hendrickson ("Hendrickson"), F&P's Product Manager, to inform him that Whitford was leaving SMP and forming Alpha with Hall and Thompson.  Hendrickson has testified that Whitford informed him during that call that SMP had plans to change its commission structure to pay its sales representatives only for sales growth of F&P products, which greatly concerned Hendrickson, who believed such a change would motivate SMP's representatives to sell other product lines over that of F&P.  (Docket No. 67-6 at pp. 29-30, 35-37.)  Whitford informed Hendrickson that Alpha would not adopt such a commission structure, and would employ a more standard structure that F&P favored.  (*Id.*)  The defendants have introduced an affidavit from Hendrickson in which he states that (1) F&P was previously concerned about its relationship with SMP; (2) Whitford and Hall did not solicit F&P's business; (3) F&P made an independent business decision to terminate its relationship with SMP without ever being asked or influenced by Whitford or Hall; and (4) it was Hendrickson's decision to start a business relationship with Alpha because it was in F&P's "best interests."  (Docket No. 59-5.)

In contrast, SMP first points to record evidence that, as early as January 2014, Whitford and Hall (improperly) began recruiting Thompson to join them at Alpha because Thompson was a successful Florida territory salesperson highly valued by Hendrickson and F&P, which had a

major Florida market.  SMP maintains that the recruitment of Thompson (and its timing) signals that Whitford and Hall were engaged in a calculated, improper effort to solicit F&P.[6]  (Docket No. 68-4 at pp. 116-17.)  In addition, SMP highlights the fact that, just days before Whitford's resignation, both Whitford and Hall attended a national sales meeting for F&P at F&P's North American headquarters, where Hendrickson was present.  While Whitford and Hall deny that they informed anyone at F&P about their impending departure from SMP during the meeting, they admit to informing others in attendance of that fact.  Moreover, when deposed, Hendrickson testified that he did not make the decision to transfer F&P's business from SMP to Alpha immediately after his conversation with Whitford but, rather, made it several weeks later, on April 15, 2014.  (*Id.* at pp. 62, 67-68.)  However, on March 27, 2014, two days after his conversation with Hendrickson about Alpha, Whitford sent a text message to Hall stating: "I just had a conversation with David, [F&P] is waiting on you to give Tony your resignation before firing him and hiring us."  (Docket No. 68-8, Hall-Whitford Text Message Chain, at Hall 0937).  When questioned about this text message, Hendrickson stated that he did not remember saying anything that would lead Whitford to believe this to be true, because he had not yet made the decision to give the business to Alpha.  (Docket No. 68-6 at p. 70-73.)  On March 27, 2014, the

---

[6] There are questions of fact surrounding the alleged solicitation of Thompson by Whitford and Hall.  Thompson had worked under Whitford at SMP until September 2013. Thompson thereafter worked as an independent contractor for SMP until February 8, 2014.  SMP has introduced evidence that Hall and Whitford – by their own admission – began soliciting Thompson in January 2014.  (Docket No. 68-4 at pp. 116-17.)  SMP has also introduced testimony by Whitford that he (1) began contemplating Thompson's recruitment in December 2013; (2) emailed Thompson regarding product lines on February 11, 2014 and admitted that he must have spoken with Thompson about Alpha prior to that date; and (3) had no idea when Thompson's relationship with SMP ended (and neither did Hall).  (Docket No. 68-3 at pp. 177, 182, 109-110, 168; Docket No. 68-4 at pp. 118, 163.)

same date as the text message, Hendrickson scheduled a conference call with Lair for April 15, 2014. During that call, Hendrickson formally terminated F&P's relationship with SMP.[7]

## IV. <u>Other Facts Related to Fiduciary Duty Claim</u>

Whitford and Hall admit that they used a substantial amount of SMP's time and resources for the development of Alpha. Between January and March 2014, while still working for SMP, Hall hired an attorney to draft Alpha's partnership agreement and began working with Whitford to select product lines that Alpha intended to carry. In the same time frame, Whitford increased his efforts to find product lines for Alpha by engaging in extended discussions with manufacturers. On February 11 and 12, 2014, Whitford sent emails to Hall and Thompson for review regarding potential products Alpha could carry. By February 11, 2014, Whitford had secured Alpha's first business relationship. Much of this work was performed during SMP work hours.

Whitford concedes that he chose not to pass on certain leads to SMP about sales of products that may have been within the scope of products SMP would have been interested in carrying because Whitford was interested in retaining the opportunities for Alpha. Whitford concedes that he deliberately chose not to pass along to SMP a potential opportunity with Pedia Ventures, a manufacturer of pacifiers and medical products for babies. In addition, the week before Whitford resigned from SMP, he was contacted by one of SMP's vendors, Vermed. Whitford told Vermed that he was leaving to start Alpha, and Vermed asked Whitford if he would carry Vermed's line; Whitford agreed to consider it. Whitford did not disclose Vermed's

---

[7] SMP has adduced evidence as to damages suffered as a result of the loss of F&P as a customer. The defendants do not dispute that SMP claims these damages.

overture to SMP.  Once Alpha was created, Hall likewise solicited several of his former SMP customers to buy Vermed's products, but he was unsuccessful.  However, in SMP's Response to the defendant's Statement of Undisputed Material Facts, SMP expressly concedes that "[o]ther than [F&P], [SMP] has lost no business due to any unlawful solicitation by Mr. Hall or Mr. Whitford."  (Docket No. 68, RSUF No. 17. (emphasis added).)

According to SMP, an important part of Whitford's job was keeping SMP's internal customer management software, known as "SalesForce," up to date with contact information and call history for each customer within his territory.  After Whitford's departure, SMP discovered that the information in SalesForce regarding the customers within Whitford's territory was outdated and inaccurate.  Many of the individual contacts that Whitford had listed in SalesForce for SMP customers were no longer employed or in the same role, indicating that Whitford had not been maintaining appropriate communication with the accounts in his territory.  Moreover, when SMP's new sales representative began visiting the customers within Whitford's territory, he learned that Whitford had not visited or spoken with representatives at many of the customers in quite some time.[8]

In addition, Whitford concedes that he did not follow SMP's policy with respect to use of company email.  (Docket No. 68-3 at p. 126.)  At various times throughout the last year of his employment, SMP directed Whitford to use an SMP-issued email address, rather than his personal AOL account, for all communications sent on behalf of the company.  (*Id*. at p. 122.) Whitford did not make the change, however, because he felt that his accounts would have trouble

---

[8] The facts of this paragraph are set forth by SMP in RSUF No. 13.  The defendants have not addressed or disputed them in their motion briefing.

contacting him at his new address.  (*Id*. at p. 125.)  Whitford admits that he did not ask for assistance from SMP (such as setting up email forwarding). Instead, he chose to retain his personal email address so that his customers could always reach him.  (*Id*. at pp. 125-26.)

Four months after Hall and Whitford resigned, customer Palmetto Health left SMP.  At deposition, Sherman blamed the departure on Whitford's "neglect" but offered no further explanation or specific details.  (Docket No. 67-3 at p. 83.)

## V.     <u>Use of Confidential Information</u>

Whitford has testified that he copied customer information from SMP's internal SalesForce program, retained it after departure from SMP, and inputted it into Alpha's sales database (which was known as "Act!").  (Docket No. 67-1 at pp. 103-06.)  In addition, Hall has admitted to retaining SMP documents and data on his personal computer for eight months after his departure, including "clinical papers, brochures, former quotes, and quote templates," that Hall accessed "10 to 15 times," including for the purpose of "set[ting] up [a] price list" for Alpha.  (Docket No. 67-2 at pp. 101-102, 108.)

## VI.    <u>Procedural History</u>

On May 12, 2014, SMP filed a Complaint against the defendants.  (Docket No. 1.)  On May 20, 2014, SMP filed an Amended Complaint.  (Docket No. 8.)  On February 9, 2015, with leave of the court, SMP filed its Second Amended Complaint (the "Complaint") (Docket No. 52), which the defendants answered on March 30, 2015 (Docket No. 53).  The Complaint contains four counts.  Count One alleges breach of contract against Whitford and Hall, specifically that they breached the customer non-solicitation and confidential information non-disclosure provisions of their employment agreements with SMP.  Count Two alleges breach of

contract against Whitford and Hall, specifically that they breached the employee non-solicitation provisions of their employment agreement with SMP. Count Three alleges Whitford and Hall breached their fiduciary duties to SMP. Finally, Count Four alleges tortious interference with contractual relations and/or inducement of breach of contract against defendant Alpha.

On April 15, 2015, the defendants filed their Motion for Summary Judgment. (Docket No. 58.) On May 11, 2015, SMP filed its Response in opposition. (Docket No. 67.) On May 21, 2015, the defendants filed a Reply (Docket No. 70), and on June 8, 2015, SMP filed a Sur-Reply (Docket No. 74).

The defendants filed their Motion to Exclude Proof of Damages (Docket No. 61) on April 15, 2015, and SMP filed its Response (Docket No. 65) on May 4, 2015. The defendants filed their Motion to Exclude Declaration and Documents (Docket No. 69) on May 14, 2015, and SMP filed its Response (Docket No. 71) on June 1, 2015.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## MOTION FOR SUMMARY JUDGMENT ANALYSIS

### I.   Breach of Contract: Customer Non-Solicitation and Confidential Information Non-Disclosure Restrictive Covenants (Count One)

"Restrictive covenants that are ancillary to an employment contract are subject to strict scrutiny and will be voided by Georgia courts if they impose an unreasonable restraint on trade." *Stultz v. Safety & Compliance Mgmt.*, 648 S.E.2d 129, 131 (Ga. Ct. App. 2007); *see also* Ga. Const. of 1983, Art. III, Sec. VI, Par. V(c); Ga. Code Ann. § 13-8-2(a)(2). Courts will enforce a restrictive covenant in an employment contract only if: "(1) the restraint is reasonable; (2) founded upon valuable consideration; (3) is reasonably necessary to protect the party in whose favor it is imposed; and (4) does not unduly prejudice the interests of the public." *Trujillo v. Great S. Equipment Sales, LLC*, 657 S.E.2d 581, 583 (Ga. Ct. App. 2008) (quoting *Dent Wizard Intl. Corp. v. Brown*, 612 S.E.2d 873, 876 (Ga. Ct. App. 2005)). "Moreover, such restrictions must be strictly limited as to time, territorial effect, capacity in which the employee is prohibited from competing, and as to overall reasonableness." *Id.* "Whether the restraint imposed by the

employment contract is reasonable is a question of law for determination by the court." *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 422 S.E.2d 529, 531 (Ga. 1992).

"In restrictive covenant cases strictly scrutinized as employment contracts, Georgia does not employ the 'blue pencil' doctrine of severability." *Trujillo*, 657 S.E.2d at 585 (citing *Waldeck v. Curtis 1000, Inc.*, 583 S.E.2d 266, 269 (Ga. Ct. App. 2003)). This means that, if one part of a restrictive covenant in an employment contract is unenforceable, all aspects of the covenant are likewise unenforceable. *See Pregler v. C&Z, Inc.*, 575 S.E.2d 915, 917 (Ga. Ct. App. 2003). In other words, offensive restrictions cannot be deleted from an agreement by a court by means of being crossed out with a "blue pencil," leaving other restrictions enacted in the same provision at the same time enforceable. *See also Advance Technology Consultants, Inc. v. Roadtrac, LLC*, 551 S.E.2d 735, 737-38 (Ga. Ct. App. 2001) (discussing "overwhelming authority" on this point). Accordingly, under Georgia law, a finding that a portion of a restrictive covenant in an employment contract is legally unenforceable requires that the entire provision be invalidated.[9]

## A.    Hall's Customer Non-Solicitation Restrictive Covenant

Hall contends that his customer non-solicitation restrictive covenant is unenforceable as a matter of law because it is indistinguishable from a covenant that the Georgia Court of Appeals has found to be an overbroad restraint on trade. Specifically, Hall directs the court to *Fine v. Communication Trends, Inc.*, 699 S.E.2d 623 (Ga. Ct. App. 2010). The customer non-

---

[9] Georgia enacted a new statute relevant to restrictive covenants – Ga. Code Ann. § 13-8-50, *et seq.* – in 2011. However, the statute is to be given prospective effect only. *See Lowe Elec. Supply Co. v. Rexel, Inc.*, No. 5:14-CV-335, 2014 WL 5585857, at *2 (M.D. Ga. Nov. 3, 2014). It therefore is not applicable in this case, because the relevant employment agreements were executed in 2001 (Whitford) and 2009 (Hall). The court need not discuss it further.

solicitation covenant at issue in *Fine* provided, in pertinent part, as follows:

> Non-solicitation of Clients. The Employee hereby also agrees and covenants with [CTI] that throughout the period of his employment and for a period of two (2) years immediately following cessation of Employee's employment with [CTI], the Employee shall not solicit advertising media placement business similar to [CTI] on behalf of any persons or entity other than [CTI], either directly or indirectly, whether as a shareholder, partner, joint venturer, consultant, employee, officer, agent or otherwise, from any person or entity *(or otherwise contact, call upon, communicate with or attempt to communicate with any such person or entity with a view to providing advertising media placement services* competitive or potentially competitive with [CTI]).

*Id.* at 632 (emphasis supplied by Georgia court). Based upon the above-emphasized terms, the Georgia trial court held that the restrictive covenant was an overbroad unreasonable restraint of trade because it not only prohibited the employee from soliciting the employer's clients, but also prohibited the employee from "otherwise" communicating with the former clients to accept business without solicitation and regardless of who initiated the contact. *Id.*

The Georgia Court of Appeals agreed, holding that, "[w]hile a prohibition involving some affirmative act on the part of the former employee, such as solicitation, diversion, or contact of clients, may be reasonable, a covenant prohibiting a former employee from merely accepting business, without any solicitation, is not reasonable." *Id.* (quoting *Waldeck*, 583 S.E.2d at 268). *See also, e.g., Akron Pest Control v. Radar Exterminating Co.*, 455 S.E.2d 601, 603 (Ga. Ct. App. 1995) (holding that it was inappropriate to construe restrictive covenant to prohibit mere acceptance of business). The *Fine* court concluded that, because the provisions of the non-solicitation covenant also prohibited the employee from merely accepting business without solicitation, the covenant was not reasonably limited in its scope of the activities prohibited and,

as such, was void and unenforceable. *Fine*, 699 S.E.2d at 632. Applying the "blue pencil" rule, the court voided the entire non-solicitation covenant, rather than just the offending language. *Id.*

The customer non-solicitation covenant in the Hall Agreement provides, in pertinent part, as follows:

> Employee shall not (except on behalf of Company), directly or indirectly, solicit, *contact, call upon, communicate with or attempt to communicate with any Customer* or any representative of a Customer of Company for purposes of or *with a view to providing goods or services competitive with or potentially competitive with* those goods or services provided by Company.

Hall Agmt. ¶ 2.3 (emphasis added). The Hall Agreement defines "Customer" as "any person or entity" that "during the last two (2) years prior to the termination of Employee's relationship with Company, Company provided products or services . . ." *Id.* ¶ 2.1(b). Hall contends that his customer non-solicitation covenant is functionally identical to the provision voided in *Fine,* in that it bars contact with former SMP customers, irrespective of who initiates the contact, the purpose of the contact, and whether the customer is still doing business with SMP.

SMP acknowledges Hall's reliance on *Fine* but fails to engage in any meaningful discussion as to the near-identical provisions at issue in that case and in the Hall Agreement. Sidestepping *Fine*, SMP briefly argues that, regardless of what was written in the Hall Agreement, neither Hall nor SMP actually interpreted the customer non-solicitation covenant as broadly as it was phrased. (Docket No. 67 at p. 8.) In doing so, SMP appears to be suggesting that the court should engage in some type of intent or extrinsic evidence analysis. However, SMP offers no Georgia case law in support of doing so in the context of restrictive covenants in employment agreements, which is unsurprising, given that such provisions are subject to strict

scrutiny. *Stultz*, 648 S.E.2d at 131. Moreover, there is no ambiguity in the straightforward language of the Hall Agreement that would suggest any need to go beyond the four corners. *See Global Link Logistics, Inc. v. Briles*, 674 S.E.2d 52, 54 (Ga. Ct. App. 2009) ("A covenant containing sufficiently indefinite restrictions '[can]not be saved by additional facts' and is 'void on its face.'") (quoting *Koger Properties v. Adams-Cates Co.*, 274 S.E.2d 329, 331 (Ga. 1981)); *see also Uni-Worth Enterprises v. Wilson*, 261 S.E.2d 572 (Ga. 1979) (affirming grant of interlocutory injunction when the enforceability of restrictive covenants "was a legal question which could be determined by looking solely to the language of the restrictive covenant").

The customer non-solicitation restrictive covenant in the Hall Agreement is materially indistinguishable from the provision ruled invalid in *Fine*, and the rationale of that case aptly governs here. Hall's customer non-solicitation restrictive covenant, like the covenant in *Fine*, is therefore partially overbroad and an unreasonable restraint of trade. Accordingly, under the "blue pencil" rule, Hall's non-solicitation covenant is void in its entirety under Georgia law and cannot form the basis for a claim by SMP. Hall is, therefore, entitled to summary judgment on Count One as to SMP's claim regarding breach of his customer non-solicitation agreement.

## B. Whitford's Customer Non-Solicitation Restrictive Covenant

Whitford likewise contends that his entire customer non-solicitation restrictive covenant is void as a matter of law because it contains certain language that has previously been held to be overbroad and an unreasonable restraint on trade. Specifically, Whitford refers the court to *Wachovia Ins. Servs., Inc. v. Fallon*, 682 S.E.2d 657 (Ga. Ct. App. 2009). In *Wachovia*, the Court of Appeals considered a restrictive covenant that barred the solicitation of any "customer," where that term was defined as meaning "any individual or entity that "*has purchased* an

insurance contract through the company." *Id.* at 661. (emphasis in original). The court found that this provision was "overly broad because it can be read to preclude the employee from soliciting clients who had already severed their relationship" with the employer. *Id.*; s*ee also Gill v. Poe & Brown of Ga.*, 524 S.E.2d 328, 331 (Ga. Ct. App. 1999) (employer had no legitimate business interest in preventing solicitation of clients who may have severed relationship with employer before employee's termination); *Smith Adcock & Co. v. Rosenbohm*, 518 S.E.2d 708, 711 (Ga. Ct. App. 1999) (finding restrictive covenant that would apply to customers who had severed their relationship with employer to be "an unreasonable partial restraint of trade").

The customer non-solicitation covenant in the Whitford Agreement bars the solicitation of SMP "Customers" or "Vendors" with whom Whitford had material contact within the last year of his employment with SMP. The Whitford Agreement defines "Customers" as "those customers, including hospitals and other health care providers or distributors or sub-distributors of medical products, to which [SMP] *has sold* medical products." Whitford Agmt. ¶ 8(d) (emphasis added). Similarly, the Whitford Agreement defines "Vendors" as "those vendors and suppliers that *have sold* medical products to [SMP]." *Id.* at ¶ 1(I) (emphasis added).

SMP does not vigorously argue *Wachovia* does not govern here. Instead, SMP puts effort into the contention that *Wachovia* is, perhaps, distinguishable in this instance because the restrictive covenant at issue in that case covered a two-year period, while the Whitford Agreement only reached back one year in time, "reducing the restraint on trade" and rendering it "less likely" that the customers encompassed by the covenant had severed their relationship with SMP. (*See* Docket No. 67 at p. 13-14.) However, SMP offers no Georgia precedent for the

proposition that the language ruled a restrain of trade is to be judged on a "sliding scale" of offensiveness. Again, as discussed *supra*, restrictive covenants are strictly construed. Furthermore, SMP misapprehends the holding of *Wachovia* by focusing on the length of time of the covenants. *Wachovia's* holding is clear: where a restrictive covenant's definition of "customer" includes a past tense term that would preclude an employee from soliciting clients who may have severed their relationship with the employer, the restrictive covenant incorporating that definition is facially invalid as an unreasonable restraint on trade.

*Wachovia* is sound under Georgia law and governs here. The Whitford Agreement encompasses a prohibition on Whitford's soliciting customers that have been customers of SMP in the past but severed their relationship with SMP. The relevant language in the Whitford Agreement is directly analogous to the language disapproved in *Wachovia*. Whitford's Customer non-solicitation covenant is therefore overbroad and an unreasonable restraint of trade. Accordingly, under the "blue pencil" rule, it is void in its entirety under Georgia law and cannot form the basis for a claim by SMP. Whitford is, therefore, entitled to summary judgment on Count One as to SMP's claim regarding breach of his customer non-solicitation agreement.[10]

---

[10] This result moots the Motion to Exclude Declaration and Documents. That motion pertains to Lair's purportedly contradictory evidence as to whether F&P is a "Vendor" or "Customer," as defined by the Whitford Agreement, based upon the nature of the 2011-2014 contract between SMP and F&P. This debate is only relevant to SMP's breach of contract claim premised upon Whitford's customer non-solicitation agreement. Because the court has ruled that provision unenforceable, it need not reach the merits of the evidentiary question regarding Lair's declaration and supporting documents.

## C.   Whitford and Hall's Non-Disclosure and Confidentiality Restrictive Covenants

Count One of the Complaint also alleges that Whitford and Hall breached the non-disclosure and confidentiality provisions of their employment agreements. *See* Complaint ¶¶ 47-53. Pursuant to their employment agreements, Whitford and Hall agreed not to reproduce, use, distribute, or otherwise disseminate SMP's confidential information. *See* Hall Agmt. §2.2(a); Whitford Agmt. § 2(a). In Georgia, the "blue pencil" rule does not extend to a confidentiality and non-disclosure provision; it must be challenged separately and is not automatically voided when a related customer non-solicitation restrictive covenant is invalidated. *Fine*, 699 S.E.2d at 632; *see also Sanford v. RDA Consultants*, 535 S.E.2d 321, 324 (Ga. Ct. App. 2000) (concluding validity of non-disclosure covenant was not dependent on ruling on non-competition covenant); *Sunstates Refrigerated Svcs. v. Griffin*, 449 S.E.2d 858, 860 (Ga. Ct. App. 1994) (holding that non-competition prohibitions concerning customer solicitation must be analyzed separately from prohibitions concerning disclosure of confidential business information and "Georgia's rejection of the 'blue pencil theory of severability' does not require invalidation of the provisions concerning return of documents [and] disclosure of confidential business information"). Whitford and Hall have not moved for summary judgment on SMP's Count One breach of contract claims based on violation of the confidentiality and non-disclosure provisions of the Hall and Whitford Agreements.[11] Accordingly, these claims will proceed to trial.

---

[11] The court's Initial Case Management Order in this case states that "No motion for partial summary judgment shall be filed except upon leave of court. Any party wishing to file such a motion shall first file a separate motion that gives the justification for filing a partial summary judgment motion in terms of the overall economy of time and expense for the parties, counsel and the court." (Docket No. 26 at p. 5, ¶ K.) The defendants' failure to move for summary judgment as to part of Count One of the Complaint makes the pending motion only a

## II.    Breach of Contract: Whitford and Hall's Employee Non-Solicitation Restrictive Covenants (Count Two)

Hall and Whitford contend that the employee non-recruitment restrictive covenants contained in their employment agreements are invalid as a matter of law because they do not contain territorial restrictions.  SMP responds that territorial restrictions are not always necessary under a broad view of Georgia law.

"Under Georgia law, a valid employee non-recruitment restrictive covenant must contain a territorial limitation."  *Lowe,* 2014 WL 5585857 at *8.  "A territorial limitation is necessary to give the employee notice of what constitutes a violation of the restrictive covenant, *Fuller v. Kolb*, 234 S.E.2d 517 (Ga. 1977), and must specify with particularity the territory in which the employee is restricted, *Wiley v. Royal Cup*, 370 S.E.2d 744 (Ga. 1988)."  *W.R. Grace*, 422 S.E.2d at 529; *see also Sanford v. RDA Consultants*, 535 S.E.2d 321 (Ga. Ct. App. 2000) (finding that lack of limitation on territorial coverage made restrictive covenant unreasonably overbroad and, therefore, unenforceable as a matter of law); *Hulcher Svcs., Inc. v. R.J. Corman R.R. Co., L.L.C.*, 543 S.E.2d 461, 466-68 (Ga. Ct. App. 2000) (collecting cases regarding the nature and requirements of territorial restrictions); *Orkin Exterminating Co. v. Pelfrey*, 227 S.E.2d 251, 252 (Ga. 1976) ("Restrictive covenants in employment contracts are in partial restraint of trade and are enforceable "only if strictly limited in time and territorial effect").

Citing only two cases, SMP suggests that Georgia "routinely" upholds employment

---

partial motion for summary judgment filed without the court's permission.  This alone is grounds for denial of the defendants' motion in its entirety.  Although SMP noted that the defendants failed to address one aspect of the Complaint (see Docket No. 67 at p. 7 n.6), SMP did not request any remedy and fully briefed the motion.  The court finds that, given the resources expended to date, fairness and judicial economy favor proceeding with disposition of the Motion for Summary Judgment as filed and briefed.

agreement restrictive covenants that do not have territorial limitations. The first of these cases, *Palmer & Cay of Ga., Inc. v. Lockton Co., Inc.*, 615 S.E.2d 752 (Ga. Ct. App. 2005), *rev'd in part on other grounds*, 629 S.E.2d 800 (Ga. 2006), is very distinguishable. In *Palmer & Cay*, the court enforced a restrictive covenant that lacked a territorial limit because the employer was engaged in a business – selling insurance and employee benefit plans around the country and world – that did not adhere to traditional territorial notions. *Id.* at 756. In doing so, the Court of Appeals relied upon the Georgia Supreme Court's acknowledgment in *W.R. Grace* that there may now be unique factual scenarios wherein "[r]equiring an express geographic territorial description . . . is not in keeping with the reality of the modern business world in which an employee's 'territory' knows no geographic bounds." *Id.* This case, however, presents no such unique situation. SMP is a sales and distribution company with defined sales regions; Hall and Whitford were sales representatives with assigned territories. To the contrary, this is the type of classic business model for which a territorial restriction is required in an employment agreement restrictive covenant under Georgia common law. *W.R. Grace*, 422 S.E.2d at 529; *Hulcher Svcs.*, 543 S.E.2d at 466-68. Indeed, the *Palmer & Cay* court contrasted its decision with another case that involved traditional geographic sales territories in the southern United States in which a territorial restriction was required.[12] *See id.* at 756 (discussing *Hulcher Svcs.*, 543 S.E.2d at 463).

---

[12] Moreover, where an employee non-solicitation restrictive covenant contains no territorial restriction, courts presume the restriction applies to all of North America; thus, even if the court were inclined to consider Hall or Whitford's employee non-solicitation restrictive covenants on the merits without the territorial restriction, the court would nonetheless be obligated to conclude that the covenants were overbroad and unreasonable restraints of trade because the undisputed facts illustrate that Hall and Whitford (and Thompson) were assigned specific limited sales territories, and the North America territorial limitation far exceeds those territories. *Hulcher*, 543 S.E.2d at 466-67; *see also W.R. Grace & Co.*, 422 S.E.2d at 532 (holding that a restriction relating to the entire area in which the employer does business is

In the second case cited by SMP, *Mathis v. Orkin Exterminating Co., Inc.*, 562 S.E.2d 213, 214-15 (Ga. Ct. App. 2002), the court, in one sentence, approved an anti-piracy clause forbidding solicitation of employees on the sole grounds that it was not "vague or ambiguous." *Id.* However, there is no sign that the issue of a territorial restriction was raised in the case. Moreover, the anti-piracy clause cited by SMP was part of a paragraph of an agreement that *did* have a territorial restriction – located at the end of the paragraph. *Id.* Depending upon the *Mathis* court's interpretation of whether the territorial restriction applied to all or part of the paragraph at issue, the court may have been satisfied that a specific territorial restriction was indeed in place.

Accordingly, the lack of any territorial restriction renders the employee non-solicitation restrictive covenants in the Hall and Whitford Agreements overbroad and unreasonable restraints of trade. Under the "blue pencil" rule, both covenants are, therefore, void in their entirety under Georgia law and cannot form the basis for claims by SMP. Hall and Whitford are, therefore, entitled to summary judgment on Count Two.

## III.    Breach of Fiduciary Duty Claim (Count III)

Under Georgia law, "[i]t is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."[13]  *Jonas v. Jonas*, 633 S.E.2d 544, 549 (Ga. Ct. App.

---

generally unenforceable due to overbreadth, compared to a restriction limited to the area where the employee did business for the employer, which is presumed more reasonable).

[13] The laws of Georgia and Tennessee concerning fiduciary duty are generally, but not completely, similar. The defendants suggest Georgia law is applicable to this claim, while SMP asks the court to apply Tennessee law. When a federal court hears a diversity action, the law of the forum state, including choice-of-law rules, applies. *Montgomery v. Wyeth*, 580 F.3d 455, 459

2006); *Griffin v. Fowler*, 579 S.E.2d 848, 850 (Ga. Ct. App. 2003). An employee does not breach a fiduciary duty to an employer simply by making plans to enter a competing business while he is still employed. *Instrument Repair Serv., Inc. v. Gunby*, 518 S.E.2d 161, 163 (Ga. Ct. App. 1999). Even before the end of employment, an employee is entitled to make arrangements to compete and, upon the end of employment, he may immediately compete. *Id.* The employee is not, however, entitled to solicit customers for a rival business before the end of his employment; nor can he properly do other similar acts in direct competition with the employer's business. *Nilan's Alley, Inc. v. Ginsburg*, 430 S.E.2d 368, 369 (Ga. Ct. App. 1993); *E.D. Lacey Mills v. Keith*, 359 S.E.2d 148, 155 (1987) (citing Restatement (Second) of Agency, § 393 (1958)).

Hall and Whitford argue that the facts adduced by SMP concerning their actions in preparing to leave SMP and form Alpha, even if taken as true, cannot amount to a breach of fiduciary duty as a matter of law. They – in a rather conclusory fashion – contend that SMP's fiduciary duty claim regarding the alleged solicitation of F&P must fail because F&P "was not solicited." (Docket No. 58 at p. 18.) SMP contends, on the other hand, that Hall and Whitford

_____

(6th Cir. 2009); *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998). Tennessee employs the "most significant relationship" choice-of-law approach from the Restatement (Second) of Conflict of Laws. *Montgomery*, 580 F.3d at 459. "Under this approach, 'the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation.'" *Id.* (quoting *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)). This is because, "'generally[,] the law of the state where the injury occurred will have the most significant relationship to the litigation.'" *Id.* (quoting *Hataway*, 830 S.W.2d at 59). The court finds that, because (1) the employment relationship stemmed from employment contracts executed under Georgia law, (2) SMP is located in Georgia, (3) the effects of the alleged harm occurred in Georgia, (4) the mechanics of the relationships between the parties had their base in Georgia, and (5) Tennessee bears a much less compelling relationship with the underlying facts of this matter, the "most significant relationship" test dictates the utilization of Georgia law.

improperly solicited F&P prior to resigning from SMP and, in doing so, Hall and Whitford went far beyond simply making plans for a competing venture in the months leading up to their departure.

The court is satisfied that SMP has adduced record evidence raising questions of fact regarding whether Hall and Whitford improperly solicited SMP customer F&P for rival business Alpha while still SMP employees. These questions of fact involve, but are not limited to, (1) what occurred during the final weeks of Hall and Whitford's employment and at the F&P sales conference; (2) the timing of Hall and Whitford's resignations and their contacts with Hendrickson at F&P; (3) Hall and Whitford's text message exchange regarding Whitford's call with Hendrickson;[14] and (4) the reason for, and timing of, Hendrickson's firing of SMP and hiring of Alpha. SMP has also adduced evidence of various other activities in which the defendants engaged that went beyond simply "making plans" and crossed into "other acts in direct competition" with SMP. These actions involved (1) spending excessive amounts of SMP time researching competitive product lines; (2) conducting self-serving research; (3) talking to potential manufacturers on Alpha's behalf on SMP time; and (4) evaluating leads for Alpha on SMP time and not sharing those leads with SMP. The defendants acknowledge that SMP claims damages from lost F&P business. Accordingly, the court finds that SMP has raised triable issues as to whether Hall and Whitford had a fiduciary duty to SMP in regard to F&P, whether they

---

[14] The parties debate whether or not the text message sent by Whitford, which states "I just had a conversation with David, F&P is waiting on you to give Tony your resignation before firing him and hiring us," is inadmissible hearsay. The first part of the message is not hearsay because it is a statement made by Whitford, a party opponent. Fed R. Evid. 801(d)(2). SMP contends that the second part of the message is not hearsay because it is not offered to prove the truth of the matter asserted therein. Fed . R. Evid. 801(c)(2). That evidentiary ruling is one that, in all likelihood, must remain for decision at trial.

breached that duty by soliciting F&P, and whether SMP proximately suffered damages as a result.[15]

SMP has also raised the claim of a breach of Hall and Whitford's fiduciary duties as related to the solicitation of two other customers – Vermed and Pedia Ventures. However, SMP has expressly conceded that, aside from F&P, SMP has lost no business due to any other solicitation by Hall or Whitford. (Docket No. 68, RSUF No. 17.) Because there is no evidence of damage proximately caused by any attempt by Hall or Whitford (if one occurred) to solicit Vermed or Pedia Ventures, SMP cannot succeed on any fiduciary duty claim concerning them. *Ansley Marine Constr., Inc. v. Swanberg*, 660 S.E.2d 6, 9 (Ga. Ct. App. 2008).

SMP has also raised other allegations under the general rubric of its breach of fiduciary duty claim. They are premised upon a core criticism of Hall and (primarily) Whitford's neglect of SMP duties during the months leading up to their departure from SMP – for example, failing to visit SMP customers, not properly updating the SalesForce database, using company email improperly, etc. However, the solicitation of F&P aside, SMP has not adduced sufficient evidence of any damages proximately caused by any of these activities.[16] Moreover, SMP has

_____

[15] The court notes that a question of fact exists as to whether Hall was employed by either SMP or NeoMed during the period that SMP alleges Hall had a fiduciary duty to SMP. The court's finding that SMP has raised triable issues of fact sufficient to allow this claim to proceed is not a finding that SMP has raised triable issues of fact sufficient to allow this claim to proceed is not a finding that Hall (or Whitford, for that matter), actually owed a duty to SMP. It will be a matter for a jury to decide whether Hall was employed by NeoMed or SMP at the time of any solicitation of F&P and how that may affect any attendant fiduciary duty.

[16] SMP makes an insufficient attempt to do so regarding the loss of customer Palmetto Health. SMP has failed to adduce any evidence that the loss of Palmetto Health was damage proximately caused by Hall or Whitford. Palmetto Health left SMP as a customer four months *after* Hall and Whitford resigned. At Sherman's deposition, when asked "what information you have . . . that Mr. Whitford did something wrong prior to the date of [Whitford's] resignation with respect to Palmetto Health," she responded "[h]is customer is no longer ordering." (Docket

28

not offered any evidence or explanation as to how neglectful activities rose to the level of direct competition with SMP such that they would be encompassed by this cause of action.

In sum, the court will deny summary judgment as to SMP's breach of fiduciary duty claim as it relates to F&P and grant summary judgment on the claim in all other respects.

## IV.    Tortious Interference With Contract Claim against Defendant Alpha (Count Four)

For a claim of tortious interference with contract, both Georgia and Tennessee law (under which Count Four is pled) require proof of the existence and breach of an enforceable contract along with associated damages. *Culpepper v. Thompson*, 562 S.E.2d 837, 840 (2002); Tenn Code. Ann. § 47-50-109. Alpha's sole argument for dismissal of SMP's tortious interference claim against it is that SMP has failed to establish any potential breach of contract (*i.e.*, advance any breach of contract claim to trial). (Docket No. 59 at p. 20.) However, as discussed *supra*, Hall and Whitford have not moved for summary judgment on SMP's claims for breach their non-disclosure and confidentiality restrictive covenants. Alpha's argument, therefore, fails; SMP has a triable issue of fact as to the role in the breach of those restrictive covenants of Alpha, the competing entity co-owned and run by Hall and Whitford at the time that Hall and Whitford now stand accused of breaching their agreements with SMP.[17] Accordingly, the court the will deny the motion for summary judgment as to the tortious interference claim against Alpha concerning

No. 67-3 at p. 83.) In its response to the Motion for Summary Judgment, the time for SMP to "show its cards" for evidentiary purposes, SMP pointed only to the same three pages of Sherman's deposition transcript, in which she testified to the general assumption that, if a customer leaves SMP, it is "every time" due to the "neglect" of the assigned sales representative. *Id.* This alone does not create a dispute of material fact as to whether Whitford or Hall breached their fiduciary duty to SMP regarding Palmetto Health.

[17] SMP has also adduced record evidence concerning admitted use of confidential information by Hall and Whitford.

the confidentiality and non-disclosure restrictive covenants and grant the motion regarding the other restrictive covenants that the court has found herein to be invalid.[18]

## MOTION TO EXCLUDE PROOF OF DAMAGES

The defendants have brought a motion to exclude all of SMP's evidence of damages at trial under Federal Rule of Civil Procedure 37. The defendants contend that SMP never produced the "computation of each category of damages" in their initial disclosures as required by Rule 26(a)(1)(iii), nor subsequently provided a wide array of information and documents regarding alleged damages. The defendants further contend that, during the deposition of Hilary Sherman, SMP's Vice President of Finance and Rule 30(b)(6) representative designated to speak to damages, SMP engaged in "calculated discovery abuse" by intentionally thwarting the defendant's deposition of its damages representative and hindering the defendants' ability to fully investigate SMP's claimed losses. The defendants claim that SMP accomplished this, in large part, by delaying the production of a large amount of damages-related documents, which had been due on October 17, 2014, until *during* the January 30, 2015 deposition of Sherman. Specifically, the defendants aver that SMP orchestrated a production of documents four hours into Sherman's deposition instead of, as the defendants believe to have been required, well in advance of the deposition (either as a supplement to SMP's initial disclosures or in response to interrogatories and requests for document production).

---

[18] The court notes that defendants failed to adequately argue this issue, perhaps due to the fact that the Motion for Summary Judgment contains no mention of the confidentiality and non-disclosure restrictive covenants. (*See generally* Docket No. 59.) However, SMP also failed to adequately discuss the issue, limiting its response to the defendants' discussion to three generally-phrased lines in a footnote, without citation, that did not specifically reference the confidentiality and non-disclosure restrictive covenants. (*See* Docket No. 67 at p. 17 n.14.)

SMP responds by asserting that any delay was unintentional and modest and that there is no evidence that it caused the defendants any harm. SMP claims that it produced documents relevant to damages in October and November 2014, that Sherman spent time updating and "compiling supporting documentation" in the week prior to her January 30 deposition, and, accordingly, SMP produced those calculations and supporting documents. SMP highlights that counsel for the defendants did not suspend or otherwise seek to continue Sherman's deposition at its conclusion, nor did he formally raise concerns regarding that deposition or seek a discussion of the issues raised in this motion in the following two months before the close of discovery.

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires a party to make initial disclosure of "a computation of each category of damages claimed by the disclosing party. . . . " Fed. R. Civ. P. 26(a)(1). Although Rule 37(c)(1) states that, "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial," the rule also provides that such a sanction is appropriate "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In other words, notwithstanding the tough language in parts of Rule 37(c)(1), the remainder of the rule allows a court to exercise its discretion to impose a large range of discovery sanctions upon a violator including, if the court deems the violation "substantially justified" or "harmless," no sanction at all. *Compare Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 730 (S.D. Ohio 2014) (finding failure to timely disclose harmless where origin of evidence was not a surprise, it was not disclosed on eve of trial, and parties still had opportunity to conduct discovery) *with Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 370 (6th Cir. 2010) (excluding under Rule 37(c) damages evidence where party did not

disclose million dollar contract claim until six months after initial disclosures and never turned over supporting documentation for lost-profits calculation).

On balance, the court does not find the requested remedy to be necessary. First, the court finds – and does not believe that the defendants seriously argue otherwise – that the defendants were not seriously surprised by the origins of the damages that SMP seeks. The basic nature of this case is self-evident, and SMP provided descriptions of categories of damages in their initial disclosures (albeit somewhat general), some of which required further discovery to calculate. Second, the defendants have not demonstrated that they have been unduly harmed by the timing of SMP's disclosures. While the defendants' motion clearly articulates anger at the actions of SMP on January 30, 2015, it does not explain how the defendants were actually prejudiced after that date in preparing their defense. Third, the defendants' motion is significantly late and seeks an overly drastic remedy that would essentially be an unfair blow to SMP. The defendants had two months after the January 30, 2015 Sherman deposition and belated document production to address their concerns. The defendants could have terminated the deposition and demanded that it be rescheduled; sought to notice a second deposition with the cooperation of opposing counsel or the assistance of the court; met and conferred with opposing counsel regarding document issues or revised damage calculation disclosures; sought the assistance of the court with discovery via teleconference (per chambers procedures); or sought leave to file a discovery motion prior to the end of the discovery period. Any of these courses of action would have been more in line with typical good faith discovery practice and would have mitigated the need to request such a drastic remedy from the court.

Accordingly, the court concludes that exclusion under Rule 37(c) is not warranted here.

However, the court is compelled to note that this decision should not be seen as an endorsement of SMP's handling of the Sherman deposition, the surprise "document dump" as it unfolded, the manner in which Ms. Sherman appears to have conducted herself, or the cavalier attitude apparently directed at counsel for the defendants that day. Rule 30(b)(6) depositions regarding damages are events to be taken seriously, not opportunities for exercises in litigation obstructionism. Accordingly, in recognition of the fact that the Sherman deposition was problematic, while the court will deny the Motion to Exclude Proof of Damages, it will allow the defendants the opportunity to re-depose Sherman on damages issues for one day within the next thirty days.[19]

## **SUMMARY**

This decision has the following results concerning the Complaint:

1.   Summary judgment will be granted for defendants Hall and Whitford on all aspects of Count One, except it will be denied for SMP's claims of breach of contract for non-disclosure and confidentiality restrictive covenants;

2.   Summary judgment will be granted for defendants Hall and Whitford on all aspects of Count Two;

3.   Summary judgment will be granted for defendants Hall and Whitford on all aspects of Count Three, except it will be denied for the breach of fiduciary duty claim concerning F&P; and

4.   Summary judgment will be granted to defendant Alpha on Count Four, except that

---

[19] The parties shall meet and confer and, if scheduling assistance is required, contact the court to arrange a teleconference.

it will be denied for the tortious interference with contract claim against Alpha regarding Hall and Whitford's non-disclosure and confidentiality restrictive covenants.

This action will, therefore, proceed to trial on (1) SMP's breach of contract claim concerning Hall and Whitford's non-disclosure and confidentiality restrictive covenants, (2) SMP's claim of Hall and Whitford's breach of fiduciary duty concerning the solicitation of F&P, and (3) SMP's tortious interference with contract claim against Alpha concerning Hall and Whitford's non-disclosure and confidentiality restrictive covenants. The trial date in this matter has been set by prior court Order.

## CONCLUSION

The defendants' Motion for Summary Judgment (Docket No. 58) will be granted in part and denied in part as set forth herein. The defendants' Motion to Exclude All Proof of Damages Under Federal Rule of Civil Procedure 37 (Docket No. 61) will be denied. The defendants' Motion to Exclude Undisclosed Documents and Strike Paragraphs Four Through Eight of the Declaration of Anthony Lair (Docket No. 69) will be denied as moot.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge